## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:24-CV-00238

| | |
|---|---|
| REESE BRANTMEIER, on behalf of herself and all others similarly situated, | |
| *Plaintiff,* | **COMPLAINT -- CLASS ACTION** |
| *v.* | (Jury Trial Demanded) |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| *Defendant.* | |

Plaintiff Reese Brantmeier, on behalf of herself and all persons similarly situated, by and through undersigned counsel, upon personal knowledge as to the facts pertaining to herself, and upon information and belief as to all other matters, complaining of Defendant National Collegiate Athletic Association ("NCAA"), alleges and states as follows:

1

## INTRODUCTION

1.      This lawsuit is brought on behalf of a class of NCAA Division I student-athletes competing in Individual Sports[1] (the "Class") who intend to compete in non-NCAA athletic events that award prize money based on their performance in those events.[2]  Plaintiff and the Class challenge the NCAA's arbitrary and anticompetitive prize restrictions and seek declaratory and injunctive relief striking such anticompetitive rules and Bylaws of the NCAA that prevent Plaintiff and the Class from retaining full and just compensation for monetary prizes earned through their athletic performance outside of NCAA competitions without jeopardizing their NCAA eligibility.

2.      The NCAA has long instituted a money first, student-athletes second approach in its operations, rules, and regulations.  For over a century, from its inception until July 1, 2021, the NCAA prohibited the gifted student-athletes at its member institutions from receiving any compensation for their

---

[1] As used throughout this Complaint, "Individual Sports" means tennis, golf, swimming, track and field, wrestling, gymnastics, skiing, fencing, women's bowling, indoor and outdoor cross country, women's triathlon, women's equestrian, rifle, skiing, and all related team aspects.  *See* NCAA Bylaw 17.02.18.02.  All references herein to the NCAA Bylaws, Constitution, or Manual refer to the provisions of the 2023-24 NCAA Division I Manual.  NCAA, *Division I 2023-24 Manual* (Sept. 5, 2023), https://www.ncaapublications.com/p-4673-2023-2024-ncaa-division-i-manual.aspx.

[2] *See infra* ¶ 111 (definition of the "Class").

athletic performance and services beyond an athletic scholarship and certain other educational-related benefits.

3. During the same period, the NCAA has generated billions of dollars in income, primarily from the NCAA Division I Men's Basketball Tournament, and many NCAA administrators, conference commissioners, athletics directors, and coaches have commanded and continue to command seven-figure annual salaries.

4. In the 40 years since the NCAA's monopoly on regular season college football telecasts was broken up by the U.S. Supreme Court,[3] the NCAA and its most prominent members have chased television revenue via the ever-expanding geographic footprints of their conferences notwithstanding the deleterious effect on the academic and athletic performance of student-athletes.

5. Commencing with the 2024-25 academic year, three of the four remaining "Power Conferences" will have conference members thousands of miles and three time zones apart. The Big Ten Conference will stretch from Washington State and California to Maryland and Pennsylvania, the Big 12 Conference from Utah and Arizona to West Virginia and Florida, and the Atlantic Coast Conference from California to Florida and Massachusetts.

---

[3] *See NCAA v. Board of Regents*, 468 U.S. 85, 119 (1984).

6. Unlike the football programs of these Power Conference members, which charter planes and play almost exclusively on Saturdays, the vast majority of the "non-revenue" sports programs of these institutions will fly commercial from coast to coast to play weekday contests, resulting in missed class time and mental and physical fatigue of the student-athletes.

7. Commencing with the 2024-25 academic year, CBS and Warner Bros. Discovery will reportedly pay the NCAA an average of $1.1 billion annually for the television rights to the Division I Men's Basketball Tournament, and ESPN will reportedly pay an average of $115M annually to the NCAA for the television rights to other NCAA championships.[4]

8. Over the last three years, tens of millions of dollars have flowed, with the NCAA's knowledge and acquiescence, to mostly male student-athletes in the Power Conferences from third-party, booster-funded and operated collectives (the "Collectives") that are associated with virtually all NCAA FBS-level athletics departments and which sprung up in 2021 in the wake of the

---

[4] *Turner, CBS and the NCAA Reach Long-Term Multimedia Rights Extension for D1 Men's Basketball*, NCAA.com (Apr. 16, 2016), https://www.ncaa.com/news/basketball-men/article/2016-04-12/turner-cbs-and-ncaa-reach-long-term-multimedia-rights; *ESPN and NCAA Reach New, Eight-Year Media Rights Agreement*, NCAA.com (Jan. 4, 2024), https://www.ncaa.com/news/ncaa/article/2024-01-04/espn-and-ncaa-reach-new-eight-year-media-rights-agreement.

4

NCAA's temporary suspension of its rules prohibiting name, image, and likeness ("NIL") payments.

9. While these tens of millions of dollars have been paid to student-athletes under the guise of acquiring rights to utilize their NIL, the vast majority of the money is in reality "pay-for-play" compensation to student-athletes that has little or no relation to the actual market value for the supposed NIL services that the student-athletes must provide "in exchange" for that compensation.

10. It is also common knowledge that the primary purpose of the NIL payments made by these Collectives is to recruit high school athletes and transfer portal student-athletes to the institutions associated with the Collectives and to prevent currently enrolled student-athletes from transferring to other universities.

11. Nonetheless, with certain minor exceptions, the NCAA continues to prohibit student-athletes at those same institutions, who compete in sports that do not generate massive profits, from accepting cash awards, bonuses, and other monetary prizes (collectively, "Prize Money") awarded through non-NCAA competitions. The NCAA's farcical and anachronistic justification for such restrictions on payments is that the acceptance of money by student-athletes would destroy the NCAA's concept of "amateurism."

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 5 of 54

12.   While the NCAA allows its member institutions to financially benefit from the publicity associated with the student-athletes who compete in non-NCAA competitions, the NCAA prohibits the student-athletes from accepting Prize Money earned for their athletic performance and achievement in such competitions, except to cover "actual and necessary expenses." Violations of these restrictions result in a loss of the student-athlete's NCAA eligibility to play that sport at the varsity collegiate level.

13.   Plaintiff seeks to lift the veil of hypocrisy on the NCAA's practice of allowing primarily Division I football and men's basketball student-athletes, who play profit-generating sports in the Power Conferences, to receive virtually all of the pay-for-play money distributed by Collectives while prohibiting student-athletes who compete in non-revenue Individual Sports from accepting Prize Money earned in non-NCAA competitions.

14.   This lawsuit challenges the NCAA's arbitrary and anticompetitive Prize Money restrictions, seeking declaratory and injunctive relief so that student-athletes competing in Individual Sports may finally retain full and just compensation for Prize Money earned through their athletic performance outside of NCAA competitions.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

16. This Court has personal jurisdiction over Defendant because, *inter alia*, the NCAA has: (i) transacted business throughout the United States, including in this District; (ii) participated in organizing intercollegiate athletic contests throughout the United States, including in this District; (iii) had substantial contacts with the United States, including in this District; and (iv) engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Moreover, several NCAA Division I universities are also found within this District (e.g., the University of North Carolina at Chapel Hill, Duke University, Wake Forest University, North Carolina Central University, North Carolina A&T State University, Elon University).

17. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant has agents and transacts business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

7

## PARTIES

**A.     Plaintiff**

18.     Plaintiff Reese Brantmeier ("Brantmeier") is a resident of Chapel Hill, Orange County, North Carolina, and currently a sophomore student-athlete at the University of North Carolina at Chapel Hill ("UNC" or the "Tar Heels"), competing for its NCAA Division I women's tennis team.

19.     Prior to college, Brantmeier was a heavily recruited star athlete from Whitewater, Jefferson County, Wisconsin.  She was the No. 1 ranked tennis player in the United States, Great Lakes Region, and the state of Wisconsin for the 2022 high school class and was ranked as high as No. 411 in the Women's Tennis Association ("WTA") singles rankings.

20.     Brantmeier received full scholarship offers from over 200 colleges and universities, including Stanford University, University of Texas at Austin, and University of California, Los Angeles, among others.  Brantmeier ultimately signed and accepted a full scholarship offer from UNC and enrolled in August of 2022.

21.     In her true freshman season, Brantmeier played the No. 1 position for the Tar Heels, which defeated rival North Carolina State University to win the 2023 NCAA Division I Women's Tennis Team National Championship, and

she also finished runner-up in the 2023 NCAA Division I Women's Tennis Doubles National Championship, alongside teammate Elizabeth Scotty.

22. As of the date of this Complaint, Brantmeier is ranked No. 2 in singles and No. 1 in doubles by the Intercollegiate Tennis Association ("ITA").

23. As a result of her achievements, Brantmeier amassed numerous accolades, including but not limited to 2023 ITA All-American honors in both singles and doubles, 2023 NCAA Championship All-Tournament Team honors, 2023 First-Team All-ACC honors in singles and doubles, four-time ACC Freshman of the Week (Jan. 24, Feb. 14, Mar. 7, and Mar. 14), and she was named to the 2023 USTA Collegiate Summer Team, the prestigious development program for the top ten American collegiate players.

24. In addition to her on-court success, Brantmeier is an outstanding student, earning 2023 All-ACC Academic Team honors and 2023 ACC Honor Roll honors. She currently holds approximately a 3.958 GPA and is double majoring in exercise and sports science and studio art with a minor in global cinema.

**B. Defendant**

25. The NCAA is a self-described unincorporated, not-for-profit educational organization founded in 1906, and maintains its principal place of business in Indianapolis, Marion County, Indiana.

26. The NCAA is comprised of more than 1,100 colleges, universities, and athletic conferences throughout the United States, and through its Constitution and Bylaws, the NCAA governs all aspects of college sports. Such regulations are adopted by the member institutions and enforced through the NCAA's established enforcement program.

27. Currently, the NCAA's members are classed into three (3) Divisions, including 353 Division I universities and colleges. Such members operate the highest level and most lucrative college sports programs in the United States and are governed by the Division I rules and regulations issued by the NCAA.

## C. Co-Conspirators

28. Various persons, firms, corporations, organizations, and other business entities, known and unknown, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member institutions and NCAA Division I athletic conferences not named as defendants. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes. Representatives of those schools and conferences voted to adopt the NCAA's rules illegally restricting trade, and thus agreed to impose the restraint on trade described herein. All Division I

10

schools and conferences continue to benefit from those restraints of trade by virtue of their agreement to abide by the NCAA's restraints.

## FACTUAL ALLEGATIONS

**A.    Overview of the NCAA**

29.    The NCAA states that it "was founded in 1906 to protect young people from the dangerous and exploitative athletics practices of the time." Motivated by the governance of early college football, several meetings of colleges and universities were convened to initiate changes to college football playing rules, and as a result, in early-1906, such institutions became charter members of the Intercollegiate Athletic Association of the United States, which later became the NCAA.

30.    According to the NCAA, "as college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis.  In 1973, the [NCAA's] membership was divided into three legislative competitive divisions—I, II, and III.  Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007)."[5]

---

[5] Rodney K. Smith, *A Brief History of the National Collegiate Athletic Association's Role in Regulating Intercollegiate Athletics*, 11 Marquette Sports L. Rev. 9, 15 (2000).

Case 1:24-cv-00238    Document 1    Filed 03/18/24    Page 11 of 54

31.    The NCAA began administering women's athletics programs in 1980 when Divisions II and III established ten (10) championships for 1981-82.

32.    Article I of the NCAA Constitution states that the NCAA's basic purpose is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by doing so, retain a clear line of demarcation between intercollegiate athletics and professional sports."[6]

33.    The NCAA describes itself as an unincorporated not-for-profit educational organization through which the colleges and universities of the nation speak and act on athletic matters at the national level.

34.    The NCAA further describes itself as a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases, and that through the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character.

35.    The NCAA oversees 89 championships in 23 sports and more than 400,000 student-athletes competing in three divisions at approximately 1,100 colleges and universities.

---

[6] NCAA Const. art. I.

36.     According to the NCAA, each of Division I, II, and III creates its own rules governing personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and practice season—consistent with the overall governing principles of the NCAA.

37.     The NCAA Board of Governors, comprised of institution presidents, chancellors, ex-student-athletes, and other chief executives, is the highest governing body and is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies, and general principles of the NCAA.  Within the Board of Governors is a six-member Executive Committee that oversees the NCAA's governance process and proceedings.

38.     In Division I, the legislative system is based on conference representation and an eighteen-member Board of Directors, composed primarily of institution presidents or chancellors, that approves legislation.

39.     The NCAA and its members govern themselves through the NCAA Manual (the "Manual"), which is promulgated annually and contains, among other things, the NCAA's Constitution and operating Bylaws, which include nearly 500 pages of regulations governing all aspects of college sports.[7]  The

[7] NCAA, *Division I 2023-24 Manual* (Sept. 5, 2023), https://www.ncaapublications.com/p-4673-2023-2024-ncaa-division-i-manual.aspx.

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 13 of 54

Constitution and Bylaws were adopted—and may be amended—by the votes of the NCAA membership. The Manual also contains extensive provisions requiring member schools to follow NCAA rules and providing for discipline of members that fail to do so.

**B.** **The NCAA's Restrictions on Student-Athlete Compensation**

40. According to the NCAA, there are essentially two categories of student-athlete compensation—both of which have been prohibited by the NCAA under its discredited and illegal "amateurism" rules.

41. The first category is compensation associated with the use of a student-athlete's NIL rights. As discussed below, NIL compensation for student-athletes was prohibited until July 1, 2021, but following the U.S. Supreme Court's unanimous ruling in *NCAA v. Alston* and the enactment of various state laws that prevented the NCAA from enforcing its NIL rules in those states, the NCAA temporarily suspended its prohibition on NIL-related compensation.[8]

42. The second category of student-athlete compensation is what the NCAA refers to as "pay-for-play." Although virtually all the current publicity

---

[8] *See NCAA v. Alston* 141 S. Ct. 2141 (2021); Michelle Brutlag Hosick, *NCAA Adopts Interim Name, Image, and Likeness Policy*, NCAA.org (June 30, 2021), https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx.

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 14 of 54

and media reporting surrounding the NCAA centers on its anticompetitive "pay-for-play" rules, and specifically NCAA member institutions directly paying their student-athletes for athletic services, the NCAA's pay-for-play prohibitions extend even further.

43.     While the NCAA allows student-athletes who compete in Individual Sports to participate in non-NCAA competitions, it prohibits them from retaining Prize Money offered by third-parties related to their athletic performance and achievement in such events in excess of their "actual and necessary expenses."[9]

44.     At issue in the present case are the NCAA's rule regarding "Amateur Status" under Bylaw 12.1.2 and various "Exceptions to Amateurism Rules" including those under Bylaw 12.1.2.4, which specifically govern student-athletes' acceptance of Prize Money for athletic performance in certain non-NCAA competition.

45.     As an initial matter, a student-athlete is permitted to enter non-NCAA competitions against or with professional athletes:

> **12.2.3.1 Competition Against Professionals.** An individual may participate singly or as a member of an amateur team against professional athletes or professional teams.
>
> **12.2.3.2 Competition With Professionals.** An individual shall not be eligible for intercollegiate athletics in a sport if the

---

[9] NCAA Bylaws 12.1.2.4.1 and 12.1.2.4.2.2.

15

individual ever competed on a professional team (per Bylaw 12.02.12) in that sport. However, an individual may compete on a tennis, golf, two-person beach volleyball or two-person synchronized diving team with persons who are competing for cash or a comparable prize, provided the individual does not receive payment or prize money that exceeds actual and necessary expenses, which may only be provided by the sponsor of the event.[10]

46.     However, a student-athlete is barred from competing in collegiate athletics if he or she receives Prize Money for competing in such non-NCAA competitions:

**12.1.2 Amateur Status.**  An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:

(a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;

(b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;

(c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;

(d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;

(e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;

---

[10] NCAA Bylaws 12.2.3.1 and 12.2.3.2.

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 16 of 54

(f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or

(g) Enters into an agreement with an agent.[11]

47.    Nonetheless, the NCAA does allow a student-athlete to accept Prize Money up to but not exceeding the amount of his or her "actual and necessary expenses" as follows:

**12.1.2.4.1 Exception for Prize Money Based on Performance -- Sports Other Than Tennis.**  In sports other than tennis, an individual may accept prize money based on place finish or performance in an athletics event.  Such prize money may not exceed actual and necessary expenses and may be provided only by the sponsor of the event.  The calculation of actual and necessary expenses shall not include the expenses or fees of anyone other than the individual (e.g., coach's fees or expenses, family member's expenses).

**12.1.2.4.2 Exception for Prize Money -- Tennis.**

**12.1.2.4.2.1 Prior to Full-Time Collegiate Enrollment.**  In tennis, prior to full-time collegiate enrollment, an individual may accept up to $10,000 per calendar year in prize money based on place finish or performance in athletics events. Such prize money may be provided only by the sponsor of an event in which the individual participates. Once the individual has accepted $10,000 in prize money in a particular year, the individual may receive additional prize money on a per-event basis, provided such prize money does not exceed the individual's actual and necessary expenses for participation in the event. The calculation of actual and necessary expenses shall not include the expenses or fees of anyone other than the individual (e.g., coach's fees or expenses, family member's expenses).

---

[11] NCAA Bylaw 12.1.2.

**12.1.2.4.2.2 After Initial Full-Time Collegiate Enrollment.** In tennis, after full-time collegiate enrollment an individual may accept prize money based on place finish or performance in an athletics event. Such prize money may not exceed actual and necessary expenses and may be provided only by the sponsor of the event. The calculation of actual and necessary expenses shall not include the expenses or fees of anyone other than the individual (e.g., coach's fees or expenses, family member's expenses).[12]

48. Going back decades, the highest and most prestigious levels of non-NCAA competition in Individual Sports have been open to college student-athletes, including but not limited to the Winter and Summer Olympic Games, the U.S. Open Tennis Championships, the U.S. Swimming Championships, the US Track and Field Championships, the U.S. Open Golf Championship, and the U.S. Women's Open Golf Championship.

49. Moreover, such competitions have included prodigious Prize Money for individual performances—the 2023 U.S. Open Tennis Singles Champion (men's and women's) and the 2023 U.S. Open Golf Champion took home $3,000,000.00 and $3,600,000.00 in Prize Money, respectively.[13]

---

[12] NCAA Bylaws 12.1.2.4.1 and 12.1.2.4.2.

[13] *2023 US Open Prize Money and Player Compensation to Total $65 Million*, USOpen.org (Aug. 8, 2023), https://www.usopen.org/en_US/news/articles/2023-08-08/2023_us_open_prize_money_and_player_compensation_to_total_65_millio n.html; Jessica Marksbury, *Here's How Much Money Ever Player Made at the 2023 U.S. Open*, Golf.com (June 18, 2023), https://golf.com/news/how-much-money-every-player-made-2023-us-open/.

50.     Accordingly, the Prize Money restrictions under Bylaws 12.1.2.4.1 and 12.1.2.4.2 impact the earning ability of student-athletes primarily competing in individual sports.

51.     However, the NCAA's application of its Prize Money restrictions has been remarkably inconsistent.  In certain instances, such application turns on the specific competition at issue or the certain governing body's terminology for monies awarded based on athletic performance in non-NCAA competition.

52.     Under Bylaws 12.1.2.1.4.1.2 and 12.1.2.1.5.1, the NCAA allows prospective student-athletes and enrolled student-athletes to accept funds that are administered by the U.S. Olympic and Paralympic Committee pursuant to its Operation Gold program.[14]  In part, such programs allow student-athletes to earn and keep Prize Money dispensed by the Olympic governing bodies for medaling in the Olympics.  Such grant programs have been expanded to account for certain other non-NCAA competitions as well.

53.     USA Track and Field's Operation Gold Grant program awards monies each year to athletes who finish in the top eight places in that year's qualifying event in every year except an Olympic year, when only the top three

---

[14] *See* NCAA Bylaws 12.1.2.1.4.1.2 and 12.1.2.1.5.1.

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 19 of 54

places qualify.[15]  U.S. Swimming has implemented a similar structure for student-athletes.  In other words, money awarded for athletic performance in a non-NCAA competition is acceptable in the NCAA's view if it is simply termed a "grant."

## C.  Challenges to the NCAA's Compensation Restrictions

54.  It is no secret that the NCAA has come under fire for its unyielding stance against student-athlete rights and compensation.  The American public, including student-athletes themselves, has challenged the NCAA's continued monopsony[16] and oppression of student-athlete rights under the guise of "amateurism."  As widely reported, a number of student-athletes have filed class action antitrust lawsuits seeking redress for the harm caused by the NCAA's anticompetitive and illegal rules prohibiting various forms of student-athlete compensation.

55.  In 2015, the U.S. Court of Appeals for the Ninth Circuit ruled in favor the plaintiffs in a class action lawsuit brought against the NCAA challenging certain of its compensation restrictions.[17]  *O'Bannon* paved the

---

[15] *Operation Gold Grants*, USA Track & Field (Mar. 14, 2024), https://www.usatf.org/programs/elite-athletes/operation-gold-grants.

[16] "A market situation in which one buyer controls the market."  *Monopsony*, <u>Black's Law Dictionary</u> (10th ed. 2014).

[17] *O'Bannon v. NCAA*, 802 F.3d 1049, 1072-79 (9th Cir. 2015).

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 20 of 54

way for full cost-of-attendance scholarships for student-athletes and the challenging of other NCAA compensation restrictions.

56. A short time later, in *In re Athletic Grant-in-Aid Cap Antitrust Litigation*, the U.S. District Court for the Northern District of California ruled in favor of the plaintiffs in a class action lawsuit and struck down the NCAA's long-running prohibition on certain additional educational-related compensation, such as graduate or vocational school scholarships, among other things.[18] The decision in *In re Athletic Grant-in-Aid Cap Antitrust Litigation* was later affirmed by the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court.[19]

57. In *Alston*, the U.S. Supreme Court stated that, "the NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition."[20]

58. In his concurrence, Justice Kavanaugh laid bare the NCAA's use of the concept of "amateurism" as a justification for its rule prohibiting student-

---

[18] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019).

[19] *In re Athletic Grant-in-Aid Cap Antitrust Litigation*, 958 F.3d 1239, 1249 (9th Cir. 2020); *Alston*, 141 S. Ct. 2141.

[20] *Alston*, 141 S. Ct. at 2156 (emphasis in original).

athlete compensation: "[t]he bottom line is that the NCAA and its member colleges are suppressing the pay of student-athletes who collectively generate billions of dollars in revenues for colleges every year…. Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate."[21]

59. Some of the more recent litigation challenging the NCAA's unlawful restrictions has centered on student-athlete compensation related to their NIL rights. As discussed above, the NCAA had long prohibited any forms of compensation related to student-athletes' use of their NIL rights and aggressively enforced such rules. Class actions lawsuit were filed in the Northern District of California challenging the NCAA's NIL prohibitions.[22] However, the NCAA temporarily suspended its prohibition on certain types of NIL compensation on July 1, 2021 as a result of the *Alston* ruling as well as the passage of legislation in several states authorizing student-athletes to receive third-party NIL compensation notwithstanding any NCAA rules to the contrary.[23]

---

[21] *Id.* at 2168-69 (Kavanaugh, J., concurring).

[22] Complaint, *House v. NCAA*, No. 4:20-cv-03919-CW (N.D. Cal. June 15, 2020); Complaint, *Oliver v. NCAA*, No. 4:20-cv-04527-CW (N.D. Cal. July 8, 2020).

[23] *See* Hosick, *supra* note 9.

60.    In December of 2023, a class of Division I student-athletes filed suit against the NCAA seeking a permanent injunction restraining the NCAA from enforcing all its anticompetitive rules related to student-athlete compensation.[24]    In addition, the plaintiff student-athletes are seeking damages for the compensation such student-athletes would have received but for the NCAA's unlawful restraints on pay-for-play and related NIL compensation.

61.    As a result of amassing legal challenges and court rulings, the NCAA's rules prohibiting educational-related compensation, NIL-related compensation, and certain other benefits beyond "cost of attendance" scholarships have been suspended or struck down.

62.    Most recently, on January 31, 2024, the attorneys general of Tennessee and Virginia filed an antitrust lawsuit against the NCAA in the U.S. District Court for the Eastern District of Tennessee, challenging the NCAA's prohibition on NIL related compensation in the recruiting process of

---

[24] Complaint, *Carter v. NCAA*, No. 4:23-cv-06325 (N.D. Cal. Dec. 7, 2023).  The plaintiffs' complaint in *Carter* provides a comprehensive history of the NCAA's regulations restraining fair competition in the relevant market, the current financial status of college sports, as well as the litigation chipping away at the unfair confines of the NCAA's rules.  *See id.* at 1-10, 39-44.

college athletes.[25]  On or about February 23, 2024, the district court granted a preliminary injunction against the NCAA and its enforcement of such rules.[26]

63.    In response, the NCAA halted enforcement and investigations into third-party participation in NIL related activities—namely the Collectives that pay student-athletes pay-for-play compensation to attend or stay at the NCAA's member institutions.[27]

64.    Even with regard to pay-for-play, NCAA President Charlie Baker has proposed a shift in the governance of college sports to allow high-revenue athletic programs to pay certain of their student-athletes at least $30,000 annually in pay-for-play compensation through certain trust funds.[28]

65.    However, for reasons that are neither clear nor rational, the erosion of the NCAA's prohibitions and its suspension or rescission of

---

[25] Complaint, *Tennessee v. NCAA*, No. 3:24-cv-00033 (E.D. Tenn. Jan. 31, 2023).

[26] Memorandum Opinion and Order, *Tennessee*, No. 3:24-CV-00033-DCLC-DCP.

[27] *NCAA Halts Investigations into Third-Party NIL Deals*, Sports Business Journal (Mar. 3, 2024), https://www.sportsbusinessjournal.com/Articles/2024/03/03/ncaa-halts-investigations-into-third-party-nil.

[28] Ralph D. Russo, *NCAA President Charlie Baker Calls for New Tier of Division I Where Schools Can Pay Athletes*, AP News (Dec. 5, 2023), https://apnews.com/article/ncaa-baker-nilc26542c528df277385fea7167026dbe6.

education-related compensation, NIL-related compensation, and certain pay-for-play compensation rules has not been extended to include the NCAA's restrictions on student-athletes who compete in Individual Sports from accepting Prize Money paid by third-parties in connection with non-NCAA competitions.

**C.    Plaintiff's Injury from the Prize Money Restrictions**

66.    In August 2021, Brantmeier was a finalist and first runner-up in the United States Tennis Association ("USTA") Billie Jean King Girls 18's National Championship in singles, which qualified her to play in the 2021 U.S. Open Qualifying Tournament at the U.S. Open in Flushing Meadows, New York.

67.    Brantmeier advanced to the third round of singles in the 2021 U.S. Open Qualifying Tournament and lost in the first round of the main draw of the 2021 U.S. Open Mixed Doubles Championship, playing with Nick Monroe.

68.    During her 2021 tennis season as a high school junior, Brantmeier requested guidance from the NCAA regarding the acceptance of Prize Money and cataloging of expenses in connection with her prospective collegiate eligibility. The only guidance provided by the NCAA was a copy of Bylaw 12.1.2.4.2.1.[29]

---

[29] *See supra* ¶ 47.

69.     As a result of her performance in the 2021 U.S. Open, Brantmeier was entitled to receive $49,109.00 in total Prize Money from the USTA—$45,109,00 for advancing to the third round in singles, and $3,900.00 for playing in the first round of mixed doubles.  After deducting an automatic racquet stringing charge, Brantmeier earned a total of $48,913.00 in Prize Money.

70.     However, Brantmeier did not receive all of the Prize Money earned at the 2021 U.S. Open because of the NCAA's Prize Money restrictions.

71.     Specifically, under the above-cited Bylaw 12.1.2.4.2.1, she was only permitted to accept up to $10,000.00 in Prize Money on a total annual basis for all competitions during 2021, as well as reimbursement for undefined expenses associated with such competitions.

72.     Accordingly, Brantmeier was forced to forfeit much of the Prize Money earned at the 2021 U.S. Open as well as other tournaments in 2021, lest she jeopardize her eligibility to play college tennis.  In total, the NCAA's Prize Money restrictions illegally deprived her of such money earned at the 2021 U.S. Open and caused economic damage in the amount of $35,040.66.

73.     Even then, after Brantmeier enrolled at UNC in August 2022, the NCAA refused to certify her as an "amateur" for the fall 2022 season, her first on the Tar Heels' women's tennis team.

74.    Specifically, the NCAA challenged that some of the expenses submitted to the NCAA by Brantmeier incurred during the course of her 2021 U.S. Open participation were not "actual and necessary" under NCAA Bylaws, and therefore, Brantmeier had retained Prize Money in excess of her "actual and necessary" expenses in violation of NCAA Bylaws.

75.    To illustrate the farcical nature of the NCAA's enforcement, Brantmeier and her mother purchased a portable scanner in order to track and catalog receipts incurred during competitions solely for the accurate accounting of expenses to the NCAA.    The NCAA asserted that was an "unnecessary" expense.

76.    Likewise, the NCAA objected to Brantmeier's expense for a racket restringing fifteen (15) days prior to the competition, stating such expense fell outside an alleged fourteen (14) day pre-competition window that it "generally applied."   Such restriction is notably absent from the relevant NCAA Bylaws.

77.    When Brantmeier included the cost of the single hotel room that she shared with her mother during tennis tournaments as part of her expenses, the NCAA denied her mother's half of the hotel room costs.  In other words, the NCAA asserted that fifty percent (50%) of the hotel room costs should have been attributed to her mother and therefore was not an "actual and necessary"

27

expense for Brantmeier—notwithstanding the fact she was a sixteen (16) year old minor at the time.

78.     During the course of the dispute with the NCAA, Brantmeier was held out of the Tar Heels' lineup for the fall 2022 NCAA tennis season because if Brantmeier played and was later declared ineligible by the NCAA, the Tar Heels would be forced to forfeit any matches in which Brantmeier played.

79.     In January 2023, after requiring her to make a $5,100.00 contribution to a charity, Brantmeier's eligibility was finally certified by the NCAA, and she was cleared to play for the Tar Heels.[30]

80.     While Brantmeier's Prize Money pales in comparison to the pay-for-play amounts received by many student-athletes in profit generating sports, these amounts are even more critical to athletes in non-revenue, Individual Sports where professional opportunities to earn compensation after college may be fleeting and where the highest and most-prestigious levels of competition are open to student-athletes.[31]

---

[30] Brantmeier donated such amount to the Patrick W. Ryan Memorial Tennis Foundation, a 501(c)(3) non-profit which aims to promote the growth of tennis in southern Wisconsin.

[31] Seven of the top ten highest NIL valuations are male Division I football or basketball student-athletes, and eight of the top ten highest women's NIL valuations are Division I basketball student-athletes. *See On3 NIL 100*, On3 NIL (Mar. 14, 2024), https://www.on3.com/nil/rankings/player/nil-100/; *On3 Women's NIL 100*, On3 NIL (Mar. 14, 2024), https://www.on3.com/nil/rankings/player/womens-nil-100/.

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 28 of 54

81. Ironically, if the USTA had labeled the payment to Brantmeier as a "grant," the NCAA would have allowed her to keep the Prize Money without sacrificing her collegiate eligibility.

82. Similarly, if Brantmeier was paid an exorbitant amount of money by a Collective, the USTA, or a fan to attend a party or make a personal appearance in conjunction with the U.S. Open, that would be permitted NIL-related revenue, and she would be allowed to keep this money without jeopardizing her collegiate eligibility.

83. The NCAA's rules related to Prize Money restrictions for student-athletes in non-revenue, Individual Sports are completely arbitrary—particularly when viewed in the context of its other rules, restrictions, exceptions, and enforcement practices in the overall present landscape of college athletics.

84. Moreover, being forced to forgo such Prize Money presents a particularly acute harm when a student-athlete faces the prospect of injury while competing in collegiate sports that could hinder his or her ability to later earn compensation for athletic performance.

85. To that end, in February of 2024, Brantmeier tore her meniscus while practicing with the UNC for a team tournament in Seattle, Washington,

requiring immediate surgery, and she will be forced to miss the entire spring 2024 season following surgery as she continues rehabilitation.

86.    Brantmeier has filed this action to seek an injunction restraining Defendant from the continued enforcement of its anticompetitive and unlawful Prize Money restrictions on behalf of herself and all other Division I student-athletes in Individual Sports who have been wrongfully deprived—and will continue to be wrongfully deprived absent injunctive relief—of Prize Money earned for their athletic performance and achievement.

87.    The NCAA's "amateurism" argument is not a legitimate procompetitive justification for any of its Prize Money restrictions.  The NCAA has repeatedly attempted to alarm courts and the American public by arguing that the payment of athletic awards by NCAA member institutions, the continuation and expansion of full-cost-of-attendance scholarships and payments, and the payment of compensation from third parties for NIL rights would adversely affect consumer demand for Division I college athletics.  These alarms have proven to be false.  Even the NCAA now concedes that these payments and benefits to student-athletes have not diminished consumer demand.

88.    The NCAA should be working to support and encourage student-athletes in Individual Sports to compete in the highest and most prestigious

competitions in their respective sports, including non-NCAA events. Yet, for far too long, through its rules and regulations on Prize Money and expenses, the NCAA has acted to hinder and impede student-athletes in such pursuits.

89.    The NCAA cannot defend its Prize Money restrictions based on the alleged need to preserve "amateurism" and maintain the consumer demand for college sports. The NCAA's rules capping the amount that Division I student-athletes may be compensated for their athletic performance and the amount they spend in costs and expenses to participate in non-NCAA tournaments and competition has damaged and will continue to damage these student-athletes absent a Court-imposed remedy. All student-athletes would have the competitive opportunity to earn and receive Prize Money compensation absent Defendant's unlawful restraints.

## THE ILLEGAL AGREEMENT TO RESTRAIN COMPETITION

90.    While allowing NIL payments and "pay-to-play" compensation in certain aspects of college sports, the NCAA maintains its arbitrary prohibition on compensation in other areas. Essentially, in the face of numerous court rulings that certain of its prohibitions are unlawful, the NCAA continues enforcement of other facially illegal restrictions on Prize Money and will continue do so until a court of law intervenes and strikes down these restrictions.

31

91.     The restrictions on Prize Money have deprived and continue to deprive student-athletes of compensation earned for athletic performance and achievement in non-NCAA competitions.   Such restrictions unlawfully suppress the earning ability of student-athletes competing in individual sports.

92.     The NCAA's anticompetitive agreements are not secret or disputable.  They are a matter of public record, codified in the NCAA Division I Manual (the NCAA's rulebook).[32]   These rules are textbook horizontal agreements that unreasonably restrain trade by prohibiting student-athletes from obtaining more than a fixed amount of compensation (primarily in the form of a financial-aid scholarship) for their services, including by specifically prohibiting the earning of Prize Money and awards for non-NCAA competitions beyond the NCAA-approved expenses incurred in participating in the non-NCAA events.

93.     The NCAA rules are proposed, drafted, voted upon, and agreed to by the NCAA members which compete for the services of college athletes in the various relevant labor markets.  These anticompetitive rules are also strictly enforced, so that the competing NCAA student-athletes have no choice but to comply with them or face severe cartel penalties, including the loss of athletic competition eligibility.

---

[32] *See* NCAA, *supra* note 8.

94. Article 4 of the NCAA Constitution ("Rules, Compliance and Accountability") provides: "Each member institution . . . shall hold itself accountable to support and comply with the rules and principles approved by the membership. Further, each school shall ensure that its staff, student-athletes, and other individuals and groups representing the institution's athletics interests comply with applicable rules (institutional, conference, divisional and Association-wide) in the conduct of the institution's intercollegiate athletics program."[33]

95. The challenged NCAA rules that prohibit, cap, or otherwise limit the compensation that players may receive for their athletic services are illegal agreements. Such rules include but are not limited to NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 12.1.2.1.4.1, 12.1.2.1.5, 15.02.2, 15.02.6, 15.1, 16.02.3, 16.1.4, and 16.11.2 (individually, and as interpreted and applied in conjunction with one another).

96. Article 12 of the NCAA Bylaws ("Amateurism and Athletics Eligibility") is the foundation of the NCAA's unlawful agreements to prohibit compensation that may be paid to college athletes for their athletic services. Bylaw 12.1.2 provides:

> A [college athlete] loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the

---

[33] NCAA Const. art. IV.

33

individual: (a) [u]ses athletics skill (directly or indirectly) for pay in any form in that sport; [or] (b) [a]ccepts a promise of pay even if such pay is to be received following the completion of intercollegiate athletics participation ...[34]

97. Notwithstanding the NCAA's rules prohibiting student-athletes from retaining earnings for non-NCAA tournament play, the NCAA allows certain types of athletic-related compensation that clearly are not financial aid. For example, the NCAA's rules allow schools or conferences to provide specified amounts of monetary awards for "winning an individual or team conference or national championship" (NCAA Bylaw 16.1.4.2); for "special achievements, honors and distinctions" (NCAA Bylaw 16.1.4.3); and as academics or graduation incentives (NCAA Bylaw 16.1.4.5).

98. The NCAA also allows funds paid by the US Olympic and Paralympic Committee (USOPC) for its "Operation Gold Program," as well as similar awards for international athletes granted by their country's national Olympic and/or Paralympic governing body.[35]

---

[34] NCAA Bylaw 12.1.2.

[35] *See* NCAA Bylaws 12.1.2.1.4.1.2 and 12.1.2.1.5.1.

34

99. The NCAA does not have any coherent economic explanation for why certain categories of compensation are consistent with its concept of "amateurism," while others are not.[36]

100. The collective purpose and effect of the NCAA's anticompetitive rules is to suppress and restrict the amount of compensation that can be provided to student-athletes for their services, so that the amount actually paid is significantly less than what would be provided in competitive labor markets for the athletes' services.

101. In sum, the NCAA's anticompetitive, horizontal agreements (as implemented as rules and accepted and binding on NCAA member institutions) fix and severely limit the amount of compensation that college athletes may receive for their athletic services. While the NCAA has imposed many other anticompetitive rules—such as those restricting athletes' ability to profit from the commercial use of their NIL rights, or to transfer from one college or university to another at will—this Complaint is directed at its rules

---

[36] *See, e.g.*, Sept. 18, 2018 Trial Transcript, at 1302:14–21, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.* (testimony of Kevin Lennon, NCAA Vice President for Division I Governance) ("[O]ur institutions have always been able to provide educational expenses to student-athletes to support their educational pursuits and they've been able to provide benefits incidental to participation to student-athletes. And while those have changed over time, they certainly have not impacted the principle of amateurism which is we just don't pay student-athletes.").

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 35 of 54

that prohibit or restrict the acceptance of Prize Money by student-athletes in Individual Sports for athletic services provided in third-party tournaments and other non-NCAA competitions.

102. The enforcement procedures for the NCAA's anticompetitive rules are codified in Article 19 ("Infractions Program") of the NCAA Bylaws. Pursuant to Bylaw 19.01.2, "The [NCAA] infractions program shall hold institutions, coaches, administrators, other representatives and student-athletes who violate NCAA bylaws accountable for their conduct." Penalties include fines, scholarship reductions, postseason bans, and even the "death penalty," where a member institution, or specific varsity sport therein, is banned from the multi-billion-dollar business of college sports for a year or more.

## RELEVANT MARKETS

103. The relevant markets are the nationwide markets for the labor of NCAA Division I college athletes in the Individual Sports in which they compete. In these labor markets, current and prospective athletes compete for roster spots on the various Division I athletic teams. NCAA member institutions recruit and retain the best players by offering bundles of goods and services including scholarships to cover the cost of attendance, education-related benefits and awards, as well as access to state-of-the-art athletic

training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. In exchange, athletes provide their athletic services.

104. There are no reasonable substitutes for the educational and athletic opportunities offered by NCAA Division I schools in the relevant labor markets. No other division or association of collegiate athletics provides the same combination of goods and services offered in Division I. Schools in NCAA Division II, for example, provide fewer athletic scholarships than Division I schools, which results in a lower level of athletic competition, and much lower notoriety. Schools in NCAA Division III do not provide any athletic scholarships at all and offer an even lower level of competition.

105. As monopsony buyers in the relevant labor markets, the NCAA and its members have the market power to control prices and exclude competition. All NCAA members agree to abide by the NCAA's eligibility restrictions, which are used by the NCAA and its members to fix the prices college athletes can be paid for their athletic services and prohibit them from earning Prize Money from third parties.

106. The NCAA and its members further have the monopsony power to exclude from the relevant markets any school or conference that violates the NCAA's rules.

37

107. As detailed herein, the NCAA imposes a wide variety of restraints on athletes as a condition for their being able to play for a Division I team. If athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, most would choose to do so. The fact that they agree to these conditions illustrates the market power of the NCAA and their members in each of the relevant labor markets for Division I athletes.

108. In July 2021, the NCAA temporarily suspended most of its restrictions in the relevant labor markets on athletes' ability to earn compensation from third parties in exchange for the use of athletes' NIL rights.[37] But there has been no similar suspension of the NCAA's rules restricting Prize Money to participants in the relevant labor markets. These restrictions are nonsensical, arbitrary, and do not have any meaningful, lawful justification.

109. The economic harm to Division I athletes from the NCAA's Prize Money restraints in the relevant labor markets is indisputable. Student-athletes in Division I have made substantial economic contributions to their schools and conferences, and hence, the NCAA, through their athletic abilities. They have driven the NCAA and their respective schools' and conferences'

---

[37] *See* Hosick, *supra* note 9.

broadcast, sponsorship and ticket revenues and have increased the brand value of their schools, which has led to significant monetary donations from alumni and others. These student-athletes have raised the notoriety of non-NCAA events and competitions each year that they play. Absent the challenged restraints, in competitive labor markets, Division I college athletes would receive more compensation for their services as athletes than they would otherwise receive.

110. All of the Division I student-athletes have been denied the opportunity to pursue economic benefits in a competitive market free of the NCAA's restraints. This antitrust injury to the class is exacerbated by the reality that only a small percentage of college athletes ever have careers in professional athletics, and even those that do often have very short careers. For many individual sport student-athletes, college is where the value of their athletic skill is at or close to its peak and is an optimal time to realize that value. But the NCAA's anticompetitive restraints prohibit them from doing so.

111. Accordingly, on behalf of a class of all NCAA Division I student-athletes competing in individual sports, Plaintiff requests a declaratory judgment that the NCAA's rules regarding accepting Prize Money in non-NCAA competitions are unlawful as well as an injunction permanently

restraining the NCAA from enforcing its unlawful and anticompetitive rules restricting the acceptance of Prize Money for athletic performance in non-NCAA competitions.

## CLASS ALLEGATIONS

112. Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2), seeking declaratory and injunctive relief on her own behalf and on behalf of the following Class:

All persons in the United States who:

(a) At any time between March 19, 2020, and the date of judgment in this matter, competed in athletic events that awarded Prize Money based on place finish or performance in those sports defined by the NCAA as Individual Sports, and who meet all eligibility requirements to participate in NCAA intercollegiate competition, or would have met all eligibility requirements if they had not accepted Prize Money; or

(b) currently participate in NCAA Division I Individual Sports and intend to compete in athletic events that award Prize Money based on place finish or performance.[38]

113. The Class is so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time and can only be discerned through discovery, Plaintiff is informed and believes that there are over 100 members of the Class.

---

[38] "[a]thletic event" and "intercollegiate competition" are intended to have the same meaning as in the NCAA Bylaws.

114.	Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and other members of the Class sustained damages arising out of Defendant's common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendant's wrongful conduct in violation of laws as alleged herein.

115.	Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

116.	Numerous common questions of law and fact exist as to all members of the Class, and these common questions predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.	Whether Defendant acted or refused to act on grounds generally applicable to the members of the Class, causing harm to the Class thereby making final injunctive relief appropriate for the members of the Class as a whole;

b.	Whether Defendant engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Class;

41

c. Whether such conduct caused members of the Class to receive less compensation than they would have received in a truly competitive market;

d. The duration of the contract, combination, or conspiracy alleged herein;

e. Whether Defendant violated Section 1 of the Sherman Act;

f. Whether the conduct of Defendant and its co-conspirators caused injury to the business or property of Plaintiff and Class members; and,

g. Whether the Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

117. Plaintiff's claims are typical of the Class because the challenged restraints have injured Plaintiff and members of the Class.

118. Plaintiff is an adequate representative of the Class and will protect the claims and interest of the Class. Plaintiff does not have interests that conflict with those of the Class and Plaintiff will vigorously prosecute the claims alleged herein.

119. A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication,

42

economy of scale, and comprehensive supervision by a single court. The harm suffered by Plaintiff and each member of the Class is relatively small as compared to the enormous expense and burden of individual prosecution of the claims asserted in this litigation.

120.  Thus, absent class certification, it would not be feasible for Plaintiff and members of the Class to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

121.  The challenged compensation Rules implemented and forced onto student-athletes by Defendant constitute a contract, combination, and conspiracy in unreasonable restraint of trade, consisting of a continuing horizontal agreement, understanding, and concert of action among the Defendant and its co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiff

43

and Class members for their athletic services in the relevant labor markets in the United States, its territories and possessions.

122. In formulating and effectuating the Rules governing eligibility for college athletic competition, Defendant and its co-conspirators unlawfully combined and conspired to:

a. agree to artificially fix, depress, maintain, and/or stabilize Prize Money received by Plaintiff and Class members for their athletic services;

b. agree to promote and engage in a group boycott of any Division I college athlete or NCAA member who violates the Rules prohibiting the acceptance of prize money by college athletes; and

c. implement and monitor the conspiracy among cartel members.

123. The activities described above have been engaged in by Defendant and its co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize prices paid to Plaintiff and Class members for their athletic services.

124. Defendant's actions constitute an unreasonable restraint of trade.

44

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1
### Price Fixing Conspiracy

125.   Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

126.   Defendant and its co-conspirators, by and through its and its co-conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal combination and conspiracy in unreasonable restraint of trade in the relevant labor markets to artificially depress, fix, maintain, and/or stabilize the prices paid to members of the Class for the use of, and to limit supply for, their athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C.§ 1).

127.   Defendant's unlawful conduct deprived Plaintiff and members of the Class of unrestrained market-value compensation for the use of their athletic services. This unreasonable restraint on competition that fixed prices has artificially limited supply and depressed compensation paid to Plaintiff and members of the Class and deprived them of meaningful athletic opportunities outside of NCAA play.

128.   Plaintiff and members of the Class received less compensation and fewer benefits than they otherwise would have received for the use of their

Case 1:24-cv-00238   Document 1   Filed 03/18/24   Page 45 of 54

athletic services in competitive labor markets, and thus suffered antitrust injuries.

129. The NCAA has always conditioned eligibility to play Division I sports on the relinquishment to the NCAA and its members by the athlete of all rights to be compensated for their athletic services except in limited circumstances dictated by the NCAA's Rules.

130. Defendant's and its co-conspirators' abridgment of Plaintiff's and Class members' compensation rights is not justified by any legitimate procompetitive purpose. Defendant's actions are solely to enhance revenue for itself and its co-conspirators by limiting compensation to college athletes for their athletic services and limiting the non-NCAA competitions in which student-athletes compete. Defendant's actions cannot be justified by any alleged goal of "amateurism," or any legitimate procompetitive purpose. Defendant's concerted actions directly restrain the relevant labor markets without any procompetitive justification and are therefore unreasonable restraints of trade.

131. As a direct and proximate result of Defendant's anticompetitive price-fixing actions, Plaintiff and the members of the Class have been injured. Plaintiff's and Class members' injuries consist of receiving lower compensation and fewer benefits for use of their athletic services than they would have

received absent Defendant's anticompetitive price-fixing conduct. Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendant's price-fixing conduct unlawful.

132.     Defendant and its co-conspirators have collectively conspired to illegally fix, limit and depress the compensation to college athletes for their athletic services. This anticompetitive and illegal scheme has unreasonably restrained trade.

133.     The anticompetitive effects of Defendant's scheme substantially outweigh any alleged procompetitive effects that may be asserted by Defendant, including a claim that such collusive conduct is justified by the NCAA's concept of "amateurism." Moreover, reasonable and substantially less restrictive alternatives are available to Defendant's price-fixing restraints on compensation to Division I college athletes for their athletic services, to the extent any procompetitive justification for such restraints may be found to exist.

134. Alternatively, Defendant's restraints on Plaintiff's and Class members' ability to earn compensation for their athletic services should be determined to be either *per se* unlawful, or unlawful under the quick-look rule

of reason, given the experience the courts have now had in evaluating the legality of such restraints.

135. Plaintiff Brantmeier and the Class seek a declaration that the NCAA's Bylaws restricting the acceptance of Prize Money by student-athletes competing in Individual Sports in non-NCAA competitions are illegal and unenforceable.

136. Plaintiff Brantmeier and the Class seek a permanent injunction against the challenged restraints on compensation to Division I college athletes. All such athletes have suffered, and will continue to suffer, antitrust injury by being deprived of the opportunity to market their athletic services in competitive labor markets until injunctive relief is granted.

## SECOND CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1
### Group Boycott

137. Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

138. Defendant and its co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing horizontal contract, combination, and conspiracy in restraint of trade to effectuate a group boycott of any members of the Class who do not abide by the Defendant's compensation restraints on Division I athletes.

48

Defendant's group boycott/refusal to deal encompasses Defendant's concerted acts to prevent Class members from being compensated for their athletic services and/or their concerted refusal to permit compensation to be paid to members of the Class for their athletic services, in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

139. Defendant's group boycott/refusal to deal includes Defendant's concerted action to require all Class members to abide by the regulations and bylaws that require each of them to relinquish the rights to be compensated for their athletic services in a competitive market.

140. Defendant uses its eligibility rules and Bylaws as a threat of a group boycott to force all Class members, including Plaintiff, to abide by the rules against eligibility recipients of Prize Money.

141. Plaintiff and members of the Class received less compensation and fewer benefits than they otherwise would have received for the use of their athletic services in competitive labor markets, and thus suffered antirust injuries.

142. The NCAA has always conditioned eligibility to play Division I sports on the relinquishment to the NCAA and its members by the athlete of all rights to be compensated for their athletic services except in limited

49

circumstances arbitrarily dictated by the NCAA's Rules and arbitrarily enforced by the NCAA.

143. Defendant and its co-conspirators' abridgment of Plaintiff's and Class members' compensation rights through its agreed-to group boycott is not justified by any legitimate procompetitive justification. Defendant's actions are solely to enhance revenue for itself by limiting compensation to Division I athletes for their athletic services and limiting the number of non-NCAA competitions in which they participate. Defendant's concerted group boycott cannot be justified by any alleged goal of "amateurism," or any legitimate procompetitive purpose. Defendant's agreement to engage in a group boycott directly restrains the relevant labor markets without any procompetitive justification and is therefore an unreasonable restraint of trade.

144. As a direct and proximate result of Defendant's group-boycott scheme, Plaintiff and the members of the Class have been injured. Plaintiff's and Class members' injuries consist of receiving lower compensation and fewer benefits for use of their athletic services than they would have received absent Defendant's agreements to engage in a group boycott. Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendant's group-boycott conduct unlawful.

50

145. Defendant and their co-conspirators have collectively conspired to engage in a group boycott to illegally limit and depress the compensation to college athletes for their athletic services. This anticompetitive and illegal scheme has unreasonably restrained trade.

146. The anticompetitive effects of Defendant's group boycott substantially outweigh any alleged procompetitive effects that may be asserted by Defendant, including the Defendant's claim that their group-boycott Rules are justified by the NCAA's concept of "amateurism" or any procompetitive purpose. Moreover, reasonable and substantially less restrictive alternatives are available to Defendant's group-boycott Rules restricting compensation to Division I college athletes for their athletic services, to the extent any procompetitive justification for such Rules may be found to exist.

147. Alternatively, Defendant's group boycott/refusal to deal Rules that have prevented Plaintiff and Class members from earning fair-market compensation for their athletic services should be determined to be either *per se* unlawful, or unlawful under the quick-look rule of reason, given the experience the courts have now had in evaluating the legality of such restraints.

148. Plaintiff Brantmeier and the Class seek a declaration that the NCAA's Bylaws restricting the acceptance of Prize Money by student-athletes

competing in Individual Sports in non-NCAA competitions are illegal and unenforceable.

149.    Plaintiff Brantmeier and the Class seek a permanent injunction against the challenged group-boycott restraints on compensation to Division I college athletes. All such athletes have suffered, and will continue to suffer, antitrust injury by being deprived of the opportunity to market their athletic services in competitive labor markets until injunctive relief is granted.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Reese Brantmeier, individually and on behalf of the Class respectfully requests judgment as follows:

1.      For entry of an Order certifying the Class, as set forth in this Complaint, and appointing Plaintiff as Class Representative and the undersigned counsel as Class Counsel;

2.      For entry of Declaratory Judgment that the NCAA's Bylaws restricting the acceptance of Prize Money by student-athletes competing in Individual Sports in non-NCAA competitions are illegal and unenforceable;

3.      For entry of an Injunction restraining the NCAA from enforcing the foregoing unlawful and anticompetitive rules that restrict the ability of student-athletes, before or during their collegiate careers, to accept Prize Money in connection with non-NCAA competitions;

4.    For an award of Plaintiff's attorneys' fees, costs, and expenses;

5.    For a trial by jury on all claims and issues so triable; and,

6.    For such other and further relief as the Court may deem just and proper.

This the 18th day of March 2024.

                                 **MILBERG COLEMAN BRYSON**
                                 **PHILLIPS GROSSMAN, PLLC**

                        By:    */s/ Jacob M. Morse*
                               JACOB M. MORSE
                               North Carolina State Bar No. 52302
                               DANIEL K. BRYSON
                               North Carolina State Bar No. 15781
                               ARTHUR STOCK*
                               North Carolina State Bar No. 17613
                               LUCY N. INMAN*
                               North Carolina State Bar No. 17462
                               900 W. Morgan Street
                               Raleigh, North Carolina 27603
                               (919) 600-5000
                               jmorse@milberg.com
                               dbryson@milberg.com
                               astock@milberg.com
                               linman@milberg.com

                               PEGGY J. WEDGWORTH**
                               New York State Bar No. 2126159
                               405 East 50th Street
                               New York, NY 10022
                               (212) 594-5300
                               pwedgworth@milberg.com


                        [COUNSEL CONTINUED ON NEXT PAGE]


                                        53

**MILLER MONROE & PLYLER PLLC**

JASON A. MILLER
North Carolina State Bar No. 39923
ROBERT B. RADER III**
North Carolina State Bar No. 55184
JEFFREY R. MONROE
North Carolina State Bar No. 39930
WILLIAM W. PLYLER
North Carolina State Bar No. 10475
1520 Glenwood Avenue
Raleigh, North Carolina 27608
(919) 809-7346
jmiller@millermonroe.com
rrader@millermonroe.com
jmonroe@millermonroe.com
wplyler@millermonroe.com

JOEL LULLA, *Of Counsel***
New York State Bar No. 1865823
1520 Glenwood Avenue
Raleigh, North Carolina 27608
(919) 809-7346
joel_lulla@yahoo.com

*Counsel for Plaintiff and the Proposed Class*

*Motion for Admission to this Court forthcoming

**Notice of Special Appearance pursuant to LR 83.1(d) forthcoming

54