IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| REESE BRANTMEIER, on behalf of herself and all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:24-CV-238 |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, Chief District Judge.

The plaintiff, Reese Brantmeier, is a student at the University of North Carolina at Chapel Hill and a member of the UNC women's tennis team. Because of rules established by the National Collegiate Athletic Association, to which UNC subscribes, she will lose her NCAA eligibility and college scholarship if she does not forfeit prize money she earns participating in tennis matches run by third parties. In this antitrust case filed as a putative class action, she contends that the NCAA Prize Money Rules governing tennis and other Individual Sports are an unreasonable restraint that harms competition in violation of the Sherman Act.

In the pending motion, Ms. Brantmeier seeks a preliminary injunction prohibiting the NCAA from enforcing its prize money rules against any student-athlete participating in any Individual Sport while this case is pending. To prevail, she must show, among other things, a likelihood of success on the merits. Applying the rule-of-reason

framework, success on the merits requires a showing of "a substantial anticompetitive effect that harms consumers in the relevant market" and, should the defendant then show a procompetitive rationale, a showing that procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018).

A mandatory preliminary injunction is an extraordinary remedy, and the Court is not persuaded that Ms. Brantmeier has shown a likelihood of success on the merits for all of the Individual Sports. Therefore, the motion for preliminary injunction will be denied.

For purposes of resolving this motion only, the Court makes the following findings of fact, applies the following law, and reaches the following conclusions.

I. **Preliminary Injunction Standard**

To obtain a preliminary injunction, a party must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the injunctive relief is denied; (3) the balance of equities tips in its favor; and (4) injunctive relief would be in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023). "Satisfying these four factors is a high bar," *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017), because a preliminary injunction is "an extraordinary remed[y] involving the exercise of very far-reaching power." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013); *see Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). A district court need not consider all four *Winter* factors if one is clearly absent. *See Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018).

2

Here, Ms. Brantmeier is "not asking the Court to maintain the status quo until after a trial and final judgment, which is the traditional function of a preliminary injunction." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). Instead, she seeks an order altering the status quo. Such "[m]andatory preliminary injunctions are 'warranted only in the most extraordinary circumstances.'" *Id.* (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)); *see also* Doc. 21 at 1.

## II.  Likelihood of Success

For plaintiffs to demonstrate likelihood of success, they "need not establish a certainty of success, but must make a clear showing that [they are] likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (cleaned up).

### A. The Antitrust Claims

Ms. Brantmeier brings two claims for relief, both under § 1 of the Sherman Act. In her first claim, she alleges that the NCAA engages in a price-fixing conspiracy to "artificially depress, fix, maintain, and/or stabilize the prices paid to members of the Class." Doc. 1 at ¶¶ 125–136. In her second claim, she alleges that the NCAA engages in a group boycott of class members who accept prize money. Doc. 1 at ¶¶ 137–149.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423–24 (4th Cir. 2015) (quoting *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013)). Given the

3

amount of money involved, including but not limited to the NCAA's large-scale commercialization of college athletics and the amount of prize money available in at least some of these sports, *see* Doc. 26-1 at ¶¶ 67–75; Doc. 22-1 at ¶ 14; Doc. 22-3 at ¶ 15, Doc. 45 at ¶ 5, there is every reason to think that the NCAA rules prohibiting or limiting prize money are in commerce and that the Sherman Act applies to these rules.

The NCAA contends that the prize money rules are non-commercial eligibility requirements and are thus not subject to the Sherman Act. Doc. 33 at 18–19. This argument is unlikely to be successful. The NCAA's restrictions on prize money prohibit member schools from allowing student-athletes to earn outside money for athletic endeavors, an interference with inherently commercial activity. *See* Doc. 33-3 at 53. "[T]he modern legal understanding of commerce is broad, including almost every activity from which the actor anticipates economic gain." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1064–65 (9th Cir. 2015) (cleaned up) (finding post-trial that the NCAA's claim that its compensation rules are "eligibility rules that do not regulate any commercial activity" is "not credible").

Section 1 "outlaw[s] only unreasonable restraints." *Am. Express Co.*, 585 U.S. at 540 (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997)). In evaluating whether there is an unreasonable restraint of trade or commerce in violation of § 1, courts usually apply the three-step burden-shifting framework of the Rule of Reason.[1] *Id.* at 541. This

---

[1] Price-fixing and group boycott claims are often reviewed under per se analysis rather than the rule of reason. *See, e.g., United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *Klor's, Inc. v. Broadway-Hale*

requires the plaintiff to first show "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* If the plaintiff makes this initial showing, the defendant must then "show a procompetitive rationale for the restraint." *Id.* The burden then "shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542. "These three steps do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis," and application of the rule of reason varies depending on the circumstances. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 97 (2021).

As part of the rule of reason, courts must "conduct a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition." *Id.* at 81 (cleaned up). This requires an accurate definition of the relevant market, without which "there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express Co.*, 585 U.S. at 543. "The goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* at 541.

Anticompetitive effect can be established by direct evidence that includes "proof of actual detrimental effects on competition" or by indirect evidence that includes "proof

---

*Stores, Inc.*, 359 U.S. 207, 212 (1959). Ms. Brantmeier does not suggest that the prize money restrictions should be examined under the per se rule, and courts have generally applied the rule of reason to cases involving NCAA rules. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 91–93 (2021); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100–104 (1984).

of market power plus some evidence that the challenged restraint harms competition." *Id.* at 542 (cleaned up). "[A]ntitrust laws were enacted for the protection of competition, not competitors." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (cleaned up) (discussing antitrust injury); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) ("To have an anticompetitive effect, conduct must harm the competitive process and thereby harm consumers.") (cleaned up). "Theorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely, or much less is substantial in magnitude." *Dickson*, 309 F.3d at 207 (cleaned up).

Ms. Brantmeier seeks a preliminary injunction restraining the NCAA from "enforcing its amateurism rules that restrict the ability of student-athletes, before or during their collegiate careers, to accept cash awards, bonuses, and other monetary prizes awarded by third parties for their performance in non-NCAA competitions." Doc. 21 at 1. The NCAA rules Ms. Brantmeier challenges prohibit athletes from accepting prize money based on performance in athletic events beyond "actual and necessary expenses." Doc. 1 at ¶ 45–47; Doc. 22 at 7–8; Doc. 33-3 at 53.[2] The requested injunction would cover each and every identified Individual Sport.

---

[2] The record is not clear on all the differences in the NCAA's prize money rules between and among the Individual Sports, but it is clear that the rules are different for tennis than the other Individual Sports in at least one way. In sports other than tennis, athletes may only accept prize money that covers necessary expenses. Doc. 33-3 at 53 (Bylaw 12.1.2.4.1). Before full-time collegiate enrollment, tennis athletes may accept up to $10,000 per year in prize money plus money that covers necessary expenses. *Id.* (Bylaw 12.1.2.4.2.1). Only after they are enrolled full-time as students are tennis athletes limited to accepting prize money that covers necessary expenses. *Id.* (Bylaw 12.1.2.4.2.2).

6

To obtain the preliminary injunction she seeks, Ms. Brantmeier must make a clear showing that she is likely to succeed on at least one of her antitrust claims. Applying the antitrust law summarized above, this means she must first show that she will likely succeed in proving that the NCAA prize money rules have a substantial anticompetitive effect that harms consumers in each of the cognizable nationwide markets for the labor of Division I college athletes in the particular Individual Sport. Then, if the NCAA provides a procompetitive rationale for the prize money rules, Ms. Brantmeier would need to show that she will likely succeed in proving that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

B.  Market Definition

Before district courts can assess anticompetitive effect, they "must first define the relevant market." *Am. Express Co.*, 585 U.S. at 542. The relevant market is "the area of effective competition" or the "arena within which significant substitution in consumption or production occurs." *Id.* at 543. In the complaint, Ms. Brantmeier defines the relevant markets as "the nationwide markets for the labor of NCAA Division I college athletes in the Individual Sports in which they compete." Doc. 1 at ¶ 103. She defines "Individual Sports" by reference to the NCAA Bylaws. *Id.* at ¶ 1 n.1. The term "Individual Sports" includes women's bowling, cross country, women's equestrian, fencing, golf, gymnastics, rifle, skiing, swimming and diving, tennis, track and field (indoor and outdoor), women's triathlon, and wrestling. *Id.*; Doc. 33-3 at 239 (Bylaw 17.02.18.2).

In her brief, Ms. Brantmeier says the case "concerns the college education market for participants in Individual Sports, in which Division I colleges compete to recruit the

7

best high school players" by offering them scholarships, coaching, athletic facilities, and high-quality athletic competition. Doc. 22 at 18 (cleaned up). Ms. Brantmeier's expert witness, Andrew Schwarz, also uses this market definition. *See* Doc. 26-1 at ¶¶ 11, 38, 51 (stating that "the NCAA's membership controls 100% of the relevant market").[3]

Some of the Individual Sports separate NCAA competition by gender. *See* Doc. 33-2 at ¶ 49 (discussing men's and women's tennis). Others have NCAA competitions for only one gender. *See id.* at ¶ 23, 34 (stating that the NCAA only offers triathlon and bowling competitions for women). At least one sport has coeducational competition. *Id.* at ¶ 24 (noting that NCAA rifle competitions are coeducational). Ms. Brantmeier acknowledges that "[t]here is a different market for each of sports and gender divisions among the Individual Sports." Doc. 22 at 19; *see also* Doc. 26-1 at ¶ 41 (Mr. Schwarz stating that "each sport/gender constitutes a distinct relevant market").

The parties have not clearly shown the number of markets at issue in their briefing or identified them individually. As best the Court can tell, the markets number in the low twenties.

---

[3] There are some places in the record where plaintiff's counsel and expert seem to define the market as one where Division I institutions compete with each other as well as with professional sports leagues for the labor of college athletes. For example, in her brief, Ms. Brantmeier argues that an injunction will "increase competition in Prize Money tournaments," Doc. 22 at 22, implying that the market includes professional sports leagues. Mr. Schwarz similarly discusses harm to the professional sports market by the prize money rules. *See, e.g.*, Doc. 26-1 at ¶¶ 42–46; Doc. 36-3 at ¶ 47. This is a different market definition from that used in most of Ms. Brantmeier's briefing and evidence. *See* Doc. 33-2 at ¶ 40. Ms. Brantmeier has not explained why harm outside the defined market is relevant to likelihood of success, and the Court thus disregards this evidence, these arguments, and the resulting confusion over market definition, for purposes of this motion.

### C. Substantial Anticompetitive Effect

At this stage, Ms. Brantmeier must show a likelihood of success at the first step of the rule of reason: that the NCAA rules create a substantial anticompetitive effect on the consumers in each of the markets at issue. As noted *supra*, plaintiffs can demonstrate this with direct evidence which includes "reduced output, increased prices, or decreased quality in the relevant market" or with indirect evidence which includes "proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express Co.*, 585 U.S. at 542. In her briefs, Ms. Brantmeier contends that the NCAA has market power and that the challenged restraint harms competition, *see* Doc. 22 at 18–23, thus indicating that she relies on indirect evidence.

Ms. Brantmeier has shown that the NCAA controls the markets for the services of Individual Sports athletes who want to compete in NCAA Division I sports and receive a college education in exchange for their athletic services. *See* Doc. 26-1 at ¶¶ 47–52; Doc. 36-3 at ¶¶ 19–25. The NCAA has no identified competition in these markets.[4]

But the evidence of harm to competition from the prize money rules is remarkably thin. The harm must be "likely and significant," which requires courts to conduct an "examination of market circumstances." *Dickson*, 309 F.3d at 206. Yet here, Ms. Brantmeier has produced little to no evidence specific to each market. The record is

---

[4] The NCAA contends that in some of the smaller sports, Divisions II and III may compete with Division I athletics programs for players. Doc. 33 at 21; Doc. 33-2 at ¶¶ 24–25. It may be the case that in a few of the smallest sports markets, the lower divisions compete with Division I for players. But those lower divisions are NCAA organizations, not true competitors, Doc. 36-3 at ¶¶ 34–36, so the NCAA would still possess market power.

9

incomplete or silent on how many student-athletes participate in each Individual Sport, what professional opportunities offering prize money are available for each sport, and whether college athletes even have a meaningful chance of winning prize money in a particular sport. Given the requirement to evaluate harm to each specific market, she has not shown a likelihood of success.

Ms. Brantmeier contends that the prize money rules harm competition by reducing the number of athletes participating in non-NCAA prize money tournaments. Doc. 22 at 22. But that is not harm to competition in the relevant market, which Ms. Brantmeier has defined as the college athletics labor market. She also contends that the prize money rules harm competition by encouraging some of the best athletes to skip NCAA competition, thereby decreasing the quality of NCAA athletics. *Id.* Assuming without deciding this is the kind of "decreased quality" the case law contemplates, *see Am. Express Co.* 585 U.S. at 542, she has not shown that the number of players who make this decision is meaningful enough to have an actual effect on quality, at least not in every single Individual Sport.

Ms. Brantmeier says that the prize money rules harm competition in the same way that group boycotts and price-fixing agreements do: by requiring member schools to exclude athletes who accept prize money from scholarships and NCAA competition and by reducing student-athletes' compensation because they cannot earn prize money from third parties. Doc. 1 at ¶¶ 125–149; Doc. 22 at 21–22; Doc. 36 at 13. But both of these arguments depend on the implicit assumption that there is meaningful prize money available from professional athletic competitions in each sport sufficient to affect

10

competition in the market. Ms. Brantmeier has affirmatively shown that significant sums of prize money are available for a few elite athletes in a few Individual Sports: tennis,[5] bowling,[6] and perhaps swimming.[7] One might assume the same for gymnastics and golf. But even in those sports there has been no showing that the prize money rules, which affect only elite athletes who qualify for professional competitions and win prize money, result in anticompetitive effect on the market generally. And for other sports, there is no evidence at all about the availability of prize money and little to support the inference of harm to competition in those relevant markets.[8] This is insufficient to show a likelihood of success on the merits.

The Court is not saying that there must be market-wide effects for there to be harm to competition. The NCAA so contends, but it points only to one line in a Pennsylvania district court case from over a decade ago. Doc. 33 at 24 (citing *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 431 (M.D. Pa. 2013)). But nor is the Court persuaded at this point that harm to a few elite "consumers" is by itself sufficient to show harm to competition. Ms. Brantmeier so asserts, Doc. 36 at 13, but she cites no

---

[5] Doc 22-1 at ¶ 14; Doc. 22-3 at ¶ 15; Doc. 45 at ¶ 5.

[6] Doc. 22-4 at ¶¶ 8–9.

[7] Doc. 36-3 at ¶ 23.

[8] While not covered in detail in the current record, there are many differences in how all these sports operate at the collegiate and professional levels, with varying opportunities for professional competition. *See* Doc. 33-2 at ¶ 9, 22 (noting the differences in professional opportunities and compensation); *id.* at ¶ 21 (discussing differences in the NCAA's division systems, methods of scholarship distribution, and number of schools offering each sport). The differences between these markets may or may not be meaningful, but they underscore the need for the kind of assessment of each market that is not yet possible on this record.

11

legal authority for that proposition, which comes close to imposing a per se analysis. The court in *O'Bannon* did reject a "too small to matter" argument, but it did so in connection with very different markets for college football and basketball players and largely in reliance on the Supreme Court's decision in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980), which was a per se case, not a rule of reason case. 802 F.3d at 1071.

To obtain a preliminary injunction, Ms. Brantmeier must show harm to competition in each market at issue. The Court is not satisfied on this record that this standard is met, especially given the fact that Ms. Brantmeier seeks a mandatory injunction.

### III. Conclusion

In the absence of sufficient evidence to (i) conduct a fact-specific assessment of market power and structure in each of the alleged markets of individual sports, and then to (ii) determine whether the challenged rules cause anticompetitive effects, *see Am. Express Co.*, 585 U.S. at 541, 543, Ms. Brantmeier has not made a clear showing that she is likely to succeed on the merits. *See Di Biase*, 872 F.3d at 230. In the Court's discretion, it is **ORDERED** that the plaintiff's motion for preliminary injunction, Doc. 21, is **DENIED**.

This the 7th day of October, 2024.

_____
UNITED STATES DISTRICT JUDGE